

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

---

### NO. PD-0964-24

---

### MARIAN FRASER, Appellant

### v.

### THE STATE OF TEXAS

---

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW FROM THE SEVENTH COURT OF APPEALS
### McLENNAN COUNTY

---

FINLEY, J., delivered the opinion of the unanimous Court as to Parts I, II, and IV, and the opinion of the Court as to parts III and V in which RICHARDSON, NEWELL, KEEL, WALKER, and McCLURE, JJ., joined. FINLEY, J., filed a concurring opinion. YEARY, J., filed a concurring and dissenting opinion in which SCHENCK, P.J., and PARKER, J., joined. PARKER, J., filed a concurring and dissenting opinion.

**O P I N I O N**

This case returns to us after Appellant's retrial and conviction for felony murder. Appellant operated a daycare center for infants. Four-month-old C.F. died in Appellant's care. Toxicology tests revealed a toxic level of diphenhydramine in C.F.'s blood.

Appellant raises three arguments. First, she challenges the sufficiency of the evidence for her felony murder conviction, specifically whether giving diphenhydramine to a four-month-old infant is an act clearly dangerous to human life. Second, she contends that the court of appeals erred when evaluating her pre-trial motion to suppress evidence obtained from electronic devices that were seized when officers searched Appellant's home. Third, she argues that the court of appeals improperly relied upon Texas Rule of Evidence 105 when it held that she did not preserve objections to extraneous offense evidence admitted at trial.

We hold that there is legally sufficient evidence to support Appellant's conviction of felony murder. We conclude that the probable cause affidavit accompanying the warrant to seize the electronic devices and the probable cause affidavit accompanying the warrant to search the electronic devices both lack a sufficient nexus between the offense and the electronic devices seized and searched. We further conclude that the court of appeals erred in relying

upon Texas Rule of Evidence 105 in determining whether Appellant's objections were preserved.

Accordingly, we affirm in part and reverse in part the judgment of the court of appeals and remand the case for proceedings consistent with this opinion.

## I.    Background

Appellant was charged with the felony murder of C.F.,[1] a four-month-old, at Appellant's Waco day care. The State's theory at trial was that Appellant administered a lethal dose of diphenhydramine to C.F. in C.F.'s baby formula bottle, causing C.F.'s death. Appellant was convicted and sentenced to fifty years' confinement. On direct appeal, the court of appeals reversed. *Fraser v. State* (*Fraser I*), 523 S.W.3d 320, 342 (Tex. App.—Amarillo 2017). This Court granted the State's petition for discretionary review and reversed the judgment of the court of appeals. *Fraser v. State* (*Fraser II*), 583 S.W.3d 564, 571 (Tex. Crim. App. 2019). On remand, the court of appeals found egregious harm in the jury instructions, reversed the judgment of the trial court, and remanded for a new trial. *Fraser v. State* (*Fraser III*), 593 S.W.3d 883, 894 (Tex. App.—Amarillo 2019, pet. ref'd).

---

[1] We use the same abbreviation as the court of appeals to identify the infant victim.

Appellant was retried. After her second trial, she was convicted and sentenced to fifty years' confinement. On direct appeal of her retrial, the court of appeals affirmed. *Fraser v. State* (*Fraser IV*), No. 07-23-00131-CR, 2024 WL 4363741, at *13 (Tex. App.—Amarillo Oct. 1, 2024) (mem. op., not designated for publication). We granted Appellant's petition for discretionary review on three grounds.[2]

## II. Sufficiency of the Evidence

### a. Applicable Law

#### i. *Sufficiency of the Evidence*

We review a challenge to the sufficiency of the evidence under the

---

[2] The following grounds of Appellant's Petition for Discretionary Review were granted:

1) The court of appeals misapplied Rule 105 of the Rules of Evidence to incorrectly hold that objections to extraneous offenses are forfeited by not requesting a limiting instruction.

3) The court of appeals misinterpreted *Stocker*'s explanation of *Baldwin* to erroneously hold that no nexus is required between the crime and digital devices to substantiate a search warrant.

5) Is giving an infant Benadryl an act clearly dangerous to human life? Where there is no evidence of when, where, how, and in what form a child ingested Benadryl, how can the evidence possibly prove who administered it? The court of appeals erroneous sufficiency review is based upon false statements of the record, conflicting findings, a failure to review all the evidence, and consideration of discredited, inadmissible forensic testing.

The Court refused Appellant's second and fourth grounds for review.

standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Evidence is legally sufficient to support a conviction if, when viewing all of the evidence in the light most favorable to the verdict, any rational juror could have found the essential elements of the crime beyond a reasonable doubt. *McPherson v. State*, 677 S.W.3d 663, 664 (Tex. Crim. App. 2023); *Jackson*, 443 U.S. at 319.

When conducting a sufficiency review, we consider all of the evidence admitted at trial, including pieces of evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We do not sit as the thirteenth juror, and we do not substitute our judgment for that of the factfinder by reevaluating the weight and credibility of the evidence. *Edwards v. State*, 666 S.W.3d 571, 574 (Tex. Crim. App. 2023). The jury is permitted to draw reasonable inferences from the evidence adduced at trial. *Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Additionally, the jury may use common sense, common knowledge, personal experience, and observations from life when drawing inferences. *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014).

The sufficiency of the evidence is measured against the hypothetically-correct jury charge, defined by the statutory elements as modified by the

charging instrument. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically-correct jury charge is one that accurately states the law, is authorized by the indictment, does not increase the State's burden of proof, and adequately describes the offense with which the defendant is charged. *Id.*

### ii. *The charged offense*

Appellant was convicted of felony murder under Section 19.02(b)(3) of the Penal Code. Section 19.02(b)(3) provides:

(b) A person commits an offense if the person:

> (3) commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, the person commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE § 19.02(b)(3).

Count 1 of Appellant's indictment alleged that she:

> did then and there commit or attempt to commit an act clearly dangerous to human life, namely, by administering diphenhydramine to [C.F.] and/or causing [C.F.] to ingest diphenhydramine, which caused the death of [C.F.], and the said Defendant was then and there in the course of or attempted commission of a felony, to-wit: Injury to a Child [or Endangering a Child].

For purposes of felony murder, the State must prove: (1) an underlying felony, (2) an act clearly dangerous to human life, (3) the death of an individual,

(4) causation (the dangerous act causes the death), and (5) a connection between the underlying felony and the dangerous act ("in the course of and in furtherance of . . . or in immediate flight from"). *Contreras v. State*, 312 S.W.3d 566, 583–84 (Tex. Crim. App. 2010). Felony injury to a child qualifies as an underlying felony in a felony murder prosecution. *See id.* (citing *Johnson v. State*, 4 S.W.3d 254, 258 (Tex. Crim. App. 1999)).

An "act" is a voluntary or involuntary bodily movement. TEX. PENAL CODE § 1.07(a)(1). When determining whether an act is clearly dangerous to human life, we use an objective standard, rather than analyzing the subjective belief of the actor. *Lugo-Lugo v. State*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983) ("Since an act that was intended to cause serious bodily injury may not have been intended to be clearly dangerous to human life, the statute requires that the character of the act be measured by an objective standard."). There is no culpable mental state required for the act clearly dangerous to human life element of felony murder. *Lomax v. State*, 233 S.W.3d 302, 305 (Tex. Crim. App. 2007). "[T]he very essence of [felony murder] is to make a person guilty of an 'unintentional' murder when he causes another person's death during the commission of some type of a felony." *Id.*

The injury to a child statute, Section 22.04 of the Penal Code, provides:

(a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child . . . :

> (1) serious bodily injury;

> (2) serious mental deficiency, impairment, or injury; or

> (3) bodily injury.

TEX. PENAL CODE § 22.04(a).

Count 2 of Appellant's indictment alleged that she:

did intentionally or knowingly cause serious bodily injury to [C.F.], a child younger than 15 years of age by administering diphenhydramine to [C.F.] and/or causing [C.F.] to ingest diphenhydramine.

"'Child' means a person 14 years of age or younger. *Id.* § 22.04(c)(1). "'Bodily injury means physical pain, illness, or any impairment of physical condition. *Id.* § 1.07(a)(8). "'Serious bodily injury' means bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. *Id.* § 1.07(a)(46). The culpable mental states for injury to a child carry the definitions in Section 6.03 of the Penal Code. *See id.* § 6.03(a)–(d).

### b. Evidence at trial

Appellant was the owner of Spoiled Rotten Day Care in Waco. The day care exclusively accepted children between the ages of six weeks and three years of age. Appellant's day care had certain "health policies" that related to medication usage:

1) Parents were to put their child's medication in a baggy when dropping off the child.

2) Parents were required to fill out medication slips before bringing medication.

3) For non-prescription medication, parents were required to provide Appellant written instructions for administration.

Another clause of the day care's policies required that parents not schedule appointments for the children during the time of 12:30 to 3:00 p.m. every day, to avoid disrupting naptime.

During the afternoon of March 4, 2013, Appellant found C.F. unresponsive during a nap. She attempted CPR, called 9-1-1, but C.F. could not be resuscitated. During the ensuing police investigation on the night of C.F.'s death, law enforcement found written records in Appellant's home[3] documenting when the children were fed and when they were put down for a nap. C.F.'s records showed that she was last fed at 11:15 a.m. on the day of her

---

[3] Appellant operated Spoiled Rotten Day Care at her home.

death, was fed approximately six ounces of baby formula, and was put down for a nap at 12:15 p.m.

Justin Schwane, the toxicology laboratory supervisor at the Dallas County Southwestern Institute of Forensic Sciences (SWIFS), performed the final review of the postmortem toxicology testing of C.F.'s blood. Schwane testified that C.F.'s blood was positive for 1.3 milligrams per liter of diphenhydramine. He also testified that a second round of testing was performed in May of 2014 to test the amount of diphenhydramine in C.F.'s skeletal muscle and urine. C.F.'s skeletal muscle tested positive at 1.4 milligrams per kilogram of diphenylamine, and C.F.'s urine tested positive at 4.1 milligrams per liter of diphenhydramine. Schwane further testified that a therapeutic range of diphenhydramine in adults was between 0.1 to 0.2 milligrams per liter of blood, far below the amount of diphenhydramine in C.F.'s blood. Schwane also testified that, had diphenhydramine been administered to C.F. prior to arriving at the day care, she would have been experiencing symptoms—*e.g.*, lethargy and tiredness—when she arrived at the day care.

Dr. Elizabeth Ventura, a medical examiner with SWIFS, performed C.F.'s autopsy the day after her death. She testified that the level of diphenhydramine in C.F.'s postmortem blood was a fatal level for a four-

month-old infant. Dr. Ventura emphasized that a four-month-old like C.F. has an underdeveloped liver, because an infant's liver does not fully develop under two years of age. According to Dr. Ventura, medications that contain diphenhydramine, such as Benadryl, carry a warning label that instructs users not to administer the drug to infants under the age of two because doing so could cause death. On cross-examination, Dr. Ventura conceded that she could not testify with any certainty when and how the diphenhydramine in C.F.'s blood was administered, or whether it was administered in one large dose or several smaller doses.

Mary Becerra, a childcare regulation supervisor for the Department of Family and Protective Services, testified about pictures she took at Spoiled Rotten during an inspection visit on April 30, 2013, a week before C.F.'s death. As part of her investigation, Becerra took several photographs, and those photographs were admitted into evidence. While viewing the photographs that she took, Becerra noted several bottles of medication in the home, including liquid melatonin, children's Ibuprofen, and an Equate-branded bottle. The Equate-branded bottle treated allergy relief, and one of its active ingredients is diphenhydramine. Becerra also testified that Appellant kept a pill crusher, the "Pill Crusher Pulverizer Grinder," and a scale in the kitchen cabinet immediately above where Appellant stored baby formula.

Sherri Adams testified that she worked at Spoiled Rotten Day Care with Appellant at the time of C.F.'s death. Adams testified that she and Appellant were the only two employees of the day care. Adams testified about how the infants' bottles were prepared and who fed the infants. Appellant would label the bottles and microwave them in the kitchen. Then, Appellant would place the bottles for Adams in a window that connected the kitchen to the playroom. Adams testified that Appellant would tell her when to feed each child, and that the schedule for feeding the children was followed rigorously and rarely changed day-to-day. Adams testified that Appellant filled out the daily sheets for each child that indicated their feeding and nap times. Adams further testified that the babies at Spoiled Rotten "slept more" than the babies she cared for at Central Faith Child Development Center, a daycare facility in Waco that started working at after Spoiled Rotten was shut down.

Adams testified that, except for one occasion, Appellant was responsible for administering medication to the children. She testified that the medication was kept in a locked cabinet in the playroom where the children napped, and that only she and Appellant had access to the cabinet. Adams testified that on the day of her death, C.F. appeared "okay" according to "her little normal routine" and "wasn't fussy" when she arrived. Adams denied ever giving C.F. medication containing diphenhydramine. Adams testified that ordinarily

Appellant would clean up the kitchen and wash the bottles during the children's nap times, but there were at least some occasions when she cleaned the bottles. She also admitted that she never saw any medicine like Benadryl in the kitchen. When asked about Appellant's reaction to discovering C.F. unresponsive, Adams recounted that Appellant was frantic, worried, and upset.

Katrina Filz, a former employee of Appellant, testified about Appellant's patterns and practices at Spoiled Rotten during her employment. The State used Filz's testimony to demonstrate that her experience working for Appellant was like Adams's. Filz testified that she worked for Appellant for nearly six years as an assistant. Like Adams, Filz testified that Appellant prepared the bottles most of the time. Occasionally, for example, "if [Appellant] had a doctor's appointment that she had to go to or something like that, [Filz] would be responsible . . . for making bottles unless they were already made or . . . like[] warming up breast milk or whatever [Filz] had to do." Filz testified that she only gave medicine to the children if Appellant handed it to her "through [the] window." Filz also testified that the children at the day care followed a routine identical to the one Adams described. Like Adams, Filz testified that the children under Appellant's care slept "more" than children at other childcare locations she had worked at.

Dr. Patricia Wilcox, a board-certified family medicine doctor in Waco, testified that she was C.F.'s primary care doctor. She testified that on February 19, 2013, she saw C.F. for C.F.'s four-month examination and that C.F. was "perfectly normal." This doctor's visit occurred thirteen days before C.F.'s death on March 4, 2013. When questioned about diphenhydramine, Dr. Wilcox testified that she never recommended or prescribed it for C.F. because of the risk of death associated with diphenhydramine. Dr. Wilcox testified that, in her expert opinion, administering diphenhydramine to a four-month-old was an act clearly dangerous to human life, particularly because "the dosing can be tricky." As Dr. Wilcox elaborated, too much diphenhydramine can cause lethargy, fatigue, seizures, vomiting, diarrhea, and fatal heart anomalies. Dr. Wilcox testified that crushing Benadryl pills would quicken the body's absorption of diphenhydramine. Dr. Wilcox also testified that, while Benadryl pills are typically pink, crushing the pills turns them into a white powder, which mirrors the color of a bottle of baby formula.[4] Based on C.F.'s "daily card" maintained by Appellant at the day care, which specified when C.F. napped and was fed on the date of her death, Dr. Wilcox theorized that the fatal dose of diphenhydramine was administered to C.F. during her last bottle feeding at

---

[4] In fact, Dr. Wilcox used a pill crusher, an Avent baby bottle filled with water, baby formula, and a Benadryl pill, to demonstrate this to the jury.

approximately 11:15 a.m. On cross-examination, Dr. Wilcox testified that she did not know of any doctor who had prescribed diphenhydramine to an infant under the age of two and, if there was, then that doctor was not following medical guidelines that have been established for years. Based on the amount of diphenhydramine in C.F.'s autopsy's findings, Dr. Wilcox opined that C.F. was being exposed to a "regular, consistent exposure of diphenhydramine." Dr. Wilcox also testified that she never prescribed Tylenol or Motrin to C.F.

Appellant did not testify in this trial. Rather, portions of Appellant's testimony from her first trial were admitted and read to the jury. Appellant testified that it had always been her normal process to text parents about what medication their children needed or her opinion of whether the child needed medication. Evidence of a text conversation on February 20, 2013, between Appellant and C.F.'s mother, Lauren Felton, was introduced and reflected that the two discussed C.F. running a fever after receiving her four-month shots. Lauren told Appellant that she had given C.F. half a teaspoon of Tylenol and a quarter teaspoon of Motrin. Appellant asked Lauren whether the doctor prescribed C.F. Motrin, to which Lauren replied that she "didn't ask." Lauren brought Motrin and children's Tylenol to Spoiled Rotten, and Appellant administered the drugs as Lauren requested. Appellant admitted to preparing

the babies' bottles either the night before or the day of. Unlike Adams's testimony, Appellant testified that Adams would heat the babies' bottles.

Appellant testified that on the day of C.F.'s death she put C.F. down for a nap around 12:00 – 12:15 p.m. and checked on her every fifteen minutes three times. On her third check, Appellant observed C.F. asleep. Approximately ninety minutes later, around 2:30 to 2:40 p.m., Appellant received a phone call from a parent who needed to pick up her child early. After receiving that call, Appellant returned to the room and found that C.F. had totally rolled over and thrown up. C.F. was unresponsive. Appellant started compressions and CPR and asked Adams to call 9-1-1. Medical personnel were unable to resuscitate C.F.

Appellant admitted that four days after C.F.'s death, she told her daughter, Logan Fraser Hayes, by text message, to move medications—including Tylenol, Motrin, and diphenhydramine—from the playroom cabinet to a closet before a state licensing board inspector could visit the house.[5] Appellant denied administering C.F.—or any of the other children—diphenhydramine because "they were all too young." On cross-examination, the following exchange occurred:

---

[5] The text messages read: "Ok. Do me a favor. The kids' medicine is in the cabinet in the day care. Go put it in your closet" and "Just in case she looks."

Q: (by the State)                And you're pretty knowledgeable about medicine, aren't you?

A: (Appellant)                 Yes.

Q:                 I mean, you can read the labels?

A:                 Yes.

Q:                 Right. And you had even told how you corrected Lauren when she was trying to give [C.F.] Motrin?

A:                 Yes.

*Q:*                 *So do you think it's an act clearly dangerous to human life to give diphenhydramine to a 4-month-old?*

*A:*                 *Yes.*

*Q:*                 *And why is that?*

*A:*                 *Because you're not supposed to give it to them under 2 years of age.*

(Emphasis added). Appellant also admitted on cross-examination that she was the person who made the bottles, only she and her husband would have had the opportunity to put diphenhydramine in C.F.'s bottle, and that there was Benadryl in the house for Appellant's dog. Appellant's veterinarian had prescribed Benadryl for her dog. The veterinarian recommended that Appellant purchase the children's liquid version because it is easier to administer to small dogs, but Appellant opted for the tablet version.

Several parents with children at Appellant's day care testified as well. Two parents, Chris Bullajian and Julie Ingham, testified that they sent children's liquid Benadryl to the day care for treatment of their children's medical conditions. Both testified that their pediatricians prescribed liquid Benadryl along with a specific dosage amount. The parents gave liquid Benadryl to Appellant to administer to their children and provided her with their respective pediatrician's administration instructions. Several other parents testified that their children experienced symptoms consistent with diphenhydramine exposure while attending Appellant's day care. And through another parent, the State admitted text messages from Appellant:

| [Appellant]: | Have you gotten a call from the detective? |
|---|---|
| [Parent]: | What's going on? |
| [Appellant]: | I think he's just wanting to talk to y'all. Remember, I don't give medicine. |

Both of C.F.'s parents testified. Her father, Perry Felton, denied giving her diphenhydramine or consenting to anyone giving her diphenhydramine. Lauren testified that neither she nor Perry ever gave C.F. medication containing diphenhydramine. She also testified that no one else in her family had given C.F. medication containing diphenhydramine. Lauren testified that C.F. was absent from Spoiled Rotten the Friday before her death because they

had family photos. Lauren did not notice anything unusual about C.F.'s behavior either the weekend preceding her death or the day of her death. On cross-examination, Lauren was questioned about bringing Motrin and children's Tylenol to Spoiled Rotten. Under Lauren's instructions, they were to be administered to C.F. by Appellant. Lauren clarified that she followed Dr. Wilcox's instructions and that "just like Benadryl, if [Motrin's] given under a doctor's orders," then it is okay.

### c. Analysis

The evidence presented at trial, when viewed in the light most favorable to the verdict, was sufficient for a rational juror to find beyond a reasonable doubt that Appellant gave C.F. diphenhydramine and that doing so was an act clearly dangerous to human life that caused C.F.'s death.

Based on Dr. Wilcox's testimony, a rational juror could believe, beyond a reasonable doubt, that the fatal dose of diphenhydramine was administered to C.F. via her bottle at 11:15 a.m. on the morning she died. Although everyone uniformly denied administering C.F. diphenhydramine, a rational juror could believe, based on Adams and Filz's testimonies, that only Appellant would have been responsible for the preparation of the bottle by which the diphenhydramine was administered. Filz testified that Appellant ordinarily prepared and heated the babies' bottles and would then give the bottles to her

to feed the babies. So, too, did Adams. Appellant even admitted that she alone prepared the bottles every day. Appellant did contend that Adams would heat the bottles, thereby opening the possibility that Adams could have added the diphenhydramine to C.F.'s bottle before her feeding. But the jury was free to discredit Appellant's testimony, because Adams and Filz both testified that they were typically uninvolved with the bottle preparation process. According to Adams, Appellant prepared the older children's drinks, too. Based on these facts, the jury could reasonably determine that Appellant retained unilateral control over what the children drank, which positioned her to drug C.F.'s bottle with diphenhydramine. The cumulative force of the circumstantial evidence would allow a rational juror to disbelieve Appellant's testimony in which she denied administering diphenhydramine to C.F. and to credit C.F.'s parents' testimonies in which they denied the same.

Likewise, the jury could disregard Appellant's purported reason for having diphenhydramine in her kitchen cabinet. Appellant testified that she chose to use half a pill instead of the liquid version of Benadryl because her dog would not drink it, and "it was just easier to take half a pill – a pill and half it and put it in a hot dog." This testimony, however, would not assuage the jury as to why she kept a Pill Crusher Pulverizer Grinder and a scale in her kitchen cabinet immediately above where she stored baby formula, neither of

which would be necessary to split a pill in half and place it in a hot dog. Her story loses further credibility when considered in conjunction with Filz's and Adams's testimonies that Appellant prepared the babies' bottles in the kitchen—the same kitchen with the Pill Crusher Pulverizer Grinder, scale, and diphenhydramine. When combined, these facts support the jury's conclusion that Appellant administered diphenhydramine to C.F. in her baby bottle.

The jury was also free to consider the suspicious nature of the babies' regimented sleep schedule. After leaving Spoiled Rotten, Filz noticed a marked difference between the sleep schedules of babies under Appellant's care and those cared for by others. Babies under Appellant's care maintained a strict sleeping schedule, while babies under the care of others did not. Filz, Adams, and even Appellant felt free to leave the Spoiled Rotten babies unsupervised while napping for extended periods of time. On the day of C.F.'s death, Appellant waited anywhere from 90 to 105 minutes before checking the babies after C.F. fell asleep. The only reason Appellant returned to the room was because a parent wanted to pick up their child early. And during the interim, C.F. had "totally rolled over and thrown up." An effect of diphenhydramine is causing drowsiness, and it is often used as a sleeping aid. The jury could rationally infer that Appellant felt free not to check on the children because the diphenhydramine she dosed their bottles with would keep them asleep.

Based on the cumulative force of this evidence, a rational juror could conclude, beyond a reasonable doubt, that Appellant administered C.F. a lethal dose of diphenhydramine via C.F.'s bottle the morning of C.F.'s death. This was sufficient to support a finding of guilt for felony injury to a child. The evidence, when viewed in the light most favorable to the verdict, was sufficient to support the jury's conclusion that Appellant recklessly administered diphenhydramine to C.F., causing her serious bodily injury—in this case, death.

A rational juror could also conclude, beyond a reasonable doubt, that administering diphenhydramine to C.F. was an act clearly dangerous to human life. Dr. Wilcox testified as much on direct examination. Dr. Wilcox testified that administering diphenhydramine to children under the age of two years old in any amount could cause lethal cardiac and pulmonary symptoms due to underdeveloped livers. Moreover, both she and Dr. Ventura, the medical examiner who performed C.F.'s autopsy, emphasized the warning labels on Benadryl that indicated that diphenhydramine should not be administered to infants under the age of two because of the deadly effects of doing so. Dr. Ventura further testified that the amount of diphenhydramine in C.F.'s postmortem blood was a lethal dose and was the cause of C.F.'s death.

The jury could have also concluded that Appellant dosed C.F.'s bottle with powdered pills containing diphenhydramine without parental consent. In

fact, Appellant's prior experience with Bullajian and Ingham's children indicates that she knew of the inherent danger associated with administering diphenhydramine to an infant. Those parents allowed Appellant to administer diphenhydramine to their respective children only because a doctor prescribed it. In this limited situation, the infants were allowed to ingest a specified amount of liquid Benadryl. While Appellant had those prior experiences, the jury was presented with evidence that Appellant treated C.F. differently— Appellant was weighing powdered Benadryl on a scale and then mixing it into C.F.'s bottle, all without parental consent or a doctor's prescription. And Appellant admitted that giving diphenhydramine to a four-month-old was an act clearly dangerous to human life because "you're not supposed to give it to them under 2 years of age." A rational juror could have taken this testimony at face value and believed that Appellant knew of the dangers of dosing an infant with diphenhydramine before C.F.'s death. It seems dubious to believe that Appellant knew that Motrin is dangerous to children under two—as she told Lauren—but not diphenhydramine.

Based on this evidence, a rational juror could conclude that Appellant, when committing injury to a child, committed an act clearly dangerous to human life by administering diphenhydramine to C.F.

### d. Conclusion

When viewing the evidence in the light most favorable to the verdict, a rational juror could find, beyond a reasonable doubt, that Appellant had committed an act clearly dangerous to human life that caused the death of C.F. while committing felony injury to a child against C.F. *Brooks*, 323 S.W.3d at 912; *McPherson*, 677 S.W.3d at 664; *Jackson*, 443 U.S. at 319. Consequently, the evidence was sufficient to support Appellant's judgment of conviction for felony murder. The judgment of the court of appeals is affirmed in this respect.

## III. Search Warrant

In her third point of error, Appellant argues that the court of appeals erroneously failed to require a nexus between the crime and digital devices seized from her home to substantiate a search warrant. On June 12, 2013, a magistrate judge signed a search warrant that authorized police officers to search Appellant's residence and seize electronic devices and electronic storage devices. Officers executed that warrant the next day and seized multiple electronic devices. Later that month, the same magistrate judge issued a search warrant that allowed those seized electronic devices to be forensically searched by a qualified and certified technician. The probable cause affidavit in support of the second search warrant contained essentially the same factual

averments as the first, with the addition of the electronic devices and electronic storage devices seized pursuant to the first.

Appellant filed a pre-trial motion to suppress evidence obtained via those search warrants. The trial court ruled that it would admit all information found on the devices after the date of the offense. Later, the trial court allowed Appellant to file a brief in which she re-urged her motion to suppress. Appellant took issue with the "boilerplate" language used in the probable cause affidavit. During another pre-trial meeting, the parties argued the motion. The trial court reiterated its earlier ruling but agreed to make findings of fact in support of the ruling. However, the trial court did not make those findings.

The court of appeals affirmed the trial court's ruling. *See Fraser IV*, 2024 WL 4363741, at *5–8. The court agreed with Appellant that the affidavits contained boilerplate language but concluded that "[t]he affidavit contained sufficient particularized facts supporting a search of Appellant's devices which would be 'likely to produce evidence in the investigation' of C.F.'s death." *Id.* at *7–8. Consequently, the court of appeals held that the trial court did not abuse its discretion when it admitted numerous text messages between Appellant and her daughter just days after C.F.'s death. *See id.* at *8.

Appellant argues that the court of appeals erred because the probable cause affidavits did not provide the magistrate judge with the requisite nexus

between the things to be searched and the alleged offense. We agree.

### a. Applicable Law

Under the Fourth Amendment of the United States Constitution, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "Probable cause exists when, under the totality of the circumstances, there is a 'fair probability' that contraband or evidence of a crime will be found at the specified location." *State v. Duarte*, 389 S.W.3d 349, 354 (Tex. Crim. App. 2012) (first citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983); and then citing *State v. McLain*, 337 S.W.3d 268, 272 (Tex. Crim. App. 2011)).

Probable cause "is a flexible, nondemanding standard." *Id.* (citing *McLain*, 337 S.W.3d at 272). It requires more than "mere conclusory statements of an affiant's belief." *Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007) (citing *Johnson v. State*, 803 S.W.2d 272, 288 (Tex. Crim. App. 1990), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991)). "An affiant must present an affidavit that allows the magistrate to independently determine probable cause and the 'magistrate's action[s] cannot be a mere ratification of the bare conclusions of others.'" *Id.* (quoting *Johnson*, 803 S.W.2d at 288). Stated another way, the

affidavit must "establish[] a sufficient nexus between criminal activity, the things to be seized, and the place to be searched." *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013).

When "reviewing a magistrate's decision to issue a warrant, trial and appellate courts apply a highly deferential standard in keeping with the constitutional preference for a warrant." *McLain*, 337 S.W.3d at 271 (quoting *Rodriguez*, 232 S.W.3d at 61). "When in doubt, we defer to all reasonable inferences that the magistrate could have made." *Id.* 271 (quoting *Rodriguez*, 232 S.W.3d at 61). We should avoid invalidating "the warrant by interpreting the affidavit in a hypertechnical, rather than commonsense, manner." *Id.* at 272 (quoting *Rodriguez*, 232 S.W.3d at 59). Ultimately, "[t]he test is whether a reasonable reading by the magistrate would lead to the conclusion that the four corners of the affidavit provide a 'substantial basis' for issuing the warrant." *Duarte*, 389 S.W.3d at 354 (first citing *Massachusetts v. Upton*, 466 U.S. 727, 733 (1984); and then citing *Rodriguez*, 232 S.W.3d at 60).

### b. The probable cause affidavits

Affiant, Waco Police Department Detective Michael Alston, averred the following in the first search warrant affidavit:

> On March 4, 2013 Affiant responded to Providence Hospital in Waco, McLennan County, Texas. Once at Providence Hospital Affiant found that [C.F.] a four month old infant had been found unresponsive at the Spoiled Rotten Day Care located at 1725

Hilltop Drive, Waco, McLennan County, Texas. [C.F.] was transported to Providence Hospital by ambulance where she was pronounced dead shortly after arrival at the hospital.

Affiant was able to view the body of [C.F.] and saw no signs of trauma or injury to her. Affiant was also able to speak with … the parents of [C.F.], and found that [C.F.] had not been ill or having any unusual medical problems prior to her death. Affiant learned that (the mother) had taken [C.F.] to the Spoiled Rotten Day Care at around 7:45 AM on March 4, 2013, where she gave [C.F.] to Marian Fraser who is the owner/operator of Spoiled Rotten Day Care. At the time that [C.F.] was dropped off at the day care by her mother she was described as normal and fine.

Affiant was able to speak with Marian Fraser the owner/operator of Spoiled Rotten Day Care. Marian Fraser told the Affiant that [C.F.] was fine that day of March 4, 2013 when her mother dropped her off at the day care. Marian Fraser told the Affiant that nothing unusual had happened or occurred with [C.F.] that day. Marian Fraser told the Affiant that [C.F.] was given her last bottle at around 11:30 AM on March 4, 2013, and that she then was put into her playpen to have a nap at around 12:30 PM. Marian Fraser told the Affiant that at around 2:50 PM that [C.F.] was found unresponsive in her playpen.

Affiant has learned from Marian Fraser that she operates the Spoiled Rotten Daycare at 1725 Hilltop Drive in Waco, McLennan County, Texas, and that this location is also her personal residence.

The body of [C.F.] was sent to the Southwestern Institute of Forensic Sciences in Dallas, Texas for an autopsy. Affiant has received a copy of the Autopsy Report of the autopsy that was conducted on [C.F.]. The findings of the autopsy are that the Cause of Death of [C.F.] is from the Toxic Effects of diphenhydramine (Benadryl). Affiant has spoken with Dr. Keith Pinkard, Medical Examiner with the Southwestern Institute of Forensic Sciences. Dr. Pinkard has explained to the Affiant that the effects of diphenhydramine [C.F.] are fast acting. Dr. Pinkard has also told that Affiant that with the information obtained in the Affiant's

investigation that [C.F.] was fine and normal when she arrived at the daycare, and was fine up to the time she was put down for her nap; that she would have had to of [sic] be given the diphenhydramine (Benadryl) while in the care and custody of the daycare.

Affiant knows that it is common for persons to access the internet for the purpose of obtaining drug information and reactions to various drugs. Internet access can be gained by the use of a variety of electronic devices to include but not limited to, computers, laptop computers, cell phones, and electronic notebooks and net books such as but not limited to iPads, e readers, and electronic tablets. Affiant also knows that it is common for persons to send electronic messages known as e mails, text messages, and to keep/store messages sent to other persons and to themselves on the above mentioned electronic devices and on electronic storage devices such as thumb drives.

Affiant is asking for a Search Warrant to search Marian Fraser's residence also what was known as Spoiled Rotten Daycare located at 1725 Hilltop Drive in Waco, McLennan County, Texas, and to be allowed to search any and all motor vehicles that are parked on the property of 1725 Hilltop Drive, to search for a [sic] to seize any and all afore mentioned electronic devices and electronic storage devices.

The police officers who executed the first search warrant seized the following five items:

1- Apple iPhone 5 cell phone white in color with a pink otter box (Marian Fraser's cell phone)

1- Apple iPad silver in color with a red case

1- Apple iPhone black and silver in color

1- HP computer tower model P63 l 0y, serial number MXX:001082C (Pavilion P63 l 0y PC)

1- Samsung cell phone red in color (Gary Fraser's cell phone)

Twelve days after law enforcement seized those five devices, Detective Alston applied for a second search warrant. This warrant sought to allow the Waco Police Department Computer Forensic Laboratory to search the five seized devices and allow a certified technician to then analyze the data. In his second affidavit, Officer Alston reiterated, verbatim, the same factual recitations that he included in his first affidavit. After reiterating those recitations, he averred the following:

> Affiant knows that a Forensic Search of the above listed electronic property/evidence could reveal a history of internet searches, electronic messages known as e mails that are sent and received, text messages that have been sent and received, as well as messages and or postings on internet social sites such as but not limited to Facebook. A Forensic Search may also reveal stored messages and or correspondence sent to others or to themselves.

> Affiant believes that a Forensic Search of the above listed electronic property/evidence that was seized on June 13, 2013 from 1725 Hilltop Dive in Waco, McLennan County, Texas may reveal that Marian Fraser may have searched the internet after the death of [C.F.] to obtain information on the side effects of diphenhydramine (Benadryl) on infants and young children. Affiant also believes that a Forensic Search of these devices may reveal electronic mail messages, text messages, and or social networking site messages such as Facebook that were either sent or received by or to Marian Fraser that may contain information about the death of [C.F.].

### c. Analysis

In *State v. Baldwin*, this Court decided that mere "boilerplate language" from a police-officer affiant "about cell phone use among criminals" is

insufficient alone to establish probable cause to search a cell phone. 664 S.W.3d 122, 134 (Tex. Crim. App. 2022). We also said that a warrant affidavit to search a cell phone must "establish a nexus between the device and the offense" under investigation. *Id.* at 123. We explained that, within the four corners of the affidavit at issue there, "there [were] simply no facts . . . that tie[d Baldwin]'s cell phone to the offense" and "nothing about the phone being used before or during the offense." *Id.* at 134–35.

Two years later, in *Stocker v. State*, we clarified how a warrant affidavit to search a cell phone establishes the requisite nexus. 693 S.W.3d 385 (Tex. Crim. App. 2024). An affidavit may, for example, aver "reliable information suggesting that the criminal perpetrator 'used' that cell phone 'before, during, or after the crime' that is being prosecuted." *Id.* at 387 (quoting *Baldwin*, 664 S.W.3d at 135). However, that is not the only option. *See id.* at 388 ("[T]he Court [in *Baldwin*] did not say there that 'use' of a cell phone in aid of the actual perpetration of the crime that is on trial is, necessarily, the *only* 'specific fact' that can serve to establish the required 'nexus,' 'connection,' or 'tie' between a cell phone and an offense under investigation." (original emphasis)). Showing that a cell phone's owner used the phone before, during, or after the crime being prosecuted is merely "[o]ne way to establish the required 'nexus' when it comes to a warrant affidavit to search a cell phone" and is "not always

required before a magistrate may find that a search warrant affidavit 'state[s] facts and circumstances that provide . . . probable cause to believe that . . . searching the telephone . . . is likely to produce evidence in the investigation of' certain criminal activity." *Id.* at 387–88 (quoting TEX. CODE CRIM. PROC. art. 18.0215(c)(5)(B)).[6]

---

[6] Judge Yeary would have us overrule *Baldwin*. Op. of Yeary, J., at 2 ("[T]he Court itself errs, by relying upon the flawed reasoning and holding of *Baldwin*, which the Court should immediately disavow."). Judge Yeary posits that *Baldwin* conflicts with *Illinois v. Gates*, 462 U.S. 213 (1983), Op. of Yeary, J., at 4–10, and with *Riley v. California*, 573 U.S. 373 (2014), Op. of Yeary, J., at 11–14. But a careful examination of *Gates* and *Riley* confirms that *Baldwin* is consistent with both Supreme Court decisions.

Judge Yeary first contends that *Baldwin* is incompatible with *Gates*. In *Baldwin*, this Court resolved the following question in the negative: "Is generic, boilerplate language about cell phone use among criminals sufficient to establish probable cause to search a cell phone?" 664 S.W.3d at 134. We then clarified that "specific facts connecting the items to be searched to the alleged offense are required for the magistrate to reasonably determine probable cause." *Id.* That clarification is of no surprise. A reasonable person would assume that to search a cell phone, the government must substantiate its need with facts beyond an officer's general training and experience. *Brinegar v. United States*, 338 U.S. 160, 175 (1949) ("In dealing with probable cause, however, as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act."). Contrary to Judge Yeary's understanding of *Baldwin*, *Baldwin* does not require facts beyond an officer's training and experience to separately demonstrate probable cause. *Contra* Op. of Yeary, J., at 8. Rather, *Baldwin* recognized that generic boilerplate language alone does not establish probable cause to search a cell phone. Thus, to demonstrate probable cause, generic boilerplate language must be accompanied by other facts "connecting the items to be searched to the alleged offense." *Baldwin*, 664 S.W.3d at 134. This reasoning reflects the basic understanding that if general experience and training alone fail to establish probable cause, then something more is needed. *See Gates*, 462 U.S. at 239 ("sufficient information must be presented to the magistrate to allow that official to determine probable cause; *his action cannot be a mere ratification of the bare conclusions of others*.") (emphasis added).

The State argues that there was more than just mere boilerplate language in the search warrant affidavit to support the magistrate's probable cause finding to permit a seizure and search of the electronic devices from Appellant's home. We disagree.

There is nothing in the four corners of the affidavit, other than the "boilerplate" language, that creates a "nexus" between the items to be seized—the electronic devices in Appellant's home—and the offense. The only factual

---

Judge Yeary next contends that *Baldwin* is incompatible with *Riley*. In his view, because the *Riley* Court noted the prevalence of cell phone ownership among American adults, and that cell phones serve as "a digital record of nearly every aspect of their lives—from the mundane to the intimate," 573 U.S. at 395, we should "conclude that evidence of a criminal suspect's crime will probably be found in the phone [s]he keeps on or about h[er] person," *see* Op. of Yeary, J., at 11–12. Such a *per se* rule contradicts how "probable cause is a fluid concept—turning on the assessment of probabilities in *particular factual contexts.*" *Gates*, 462 U.S. at 232 (emphasis added). Probable cause, which is intertwined with the particular facts of a case, cannot be supplied by generalities untethered to the case at bar. *Cf. Riley*, 573 U.S. at 403 ("The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought."). Under *Baldwin*'s nexus requirement, such generalities, combined with some factual connection, establish probable cause. Making a factual connection to the item to be searched is not an arduous task. Indeed, as the *Riley* Court noted, "It would be a particularly inexperienced or unimaginative law enforcement officer who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone." *Id.* at 399. The discussion in *Riley* hints at the ease with which an officer could provide a link between the cell phone to be searched and the offense committed—in other words, a nexus. Yet, the officer here and in *Baldwin* failed to include a link to justify the search.

Traditionally, we have only overruled a prior case when the case was badly reasoned or is unworkable. *Proctor v. State,* 967 S.W.2d 840, 845 (Tex. Crim. App. 1998). Judge Yeary fails to make a compelling case that *Baldwin* meets either criterion.

connection between Appellant's electronic devices and the offense was the affiant stating that he knew that it was "common" for persons to use cell phones to communicate by text and phone call and to search the internet. Noticeably absent from the warrant is any factual connection between Appellant's electronic devices and the offense. In fact, if one were to exclude the three paragraphs beginning with "Affiant," there is no mention of electronic devices—either cell phones or computers—in the affidavit at all.

A bare assertion that "Affiant believes" that the seized devices "*may* reveal that [Appellant] *may* have searched the internet after" C.F.'s death "to obtain information on the side effects of diphenhydramine (Benadryl) on infants and young children," amounts to nothing more than mere speculation and a fishing expedition for information. Affiant's personal beliefs, without more, provide no basis to support probable cause. In fact, "[i]t is axiomatic . . . that mere affirmation of belief or suspicion is not enough to sustain the issuance of a search warrant." *Tolentino v. State*, 638 S.W.2d 499, 501 (Tex. Crim. App. [Panel Op.] 1982) (citing *Nathanson v. United States*, 290 U.S. 41 (1933)).

To the extent the State argues that the mere lengthy recitation of the factual background of the offense saves this warrant, that argument fails. If that were true, then the warrant in *Baldwin*—with its own lengthy factual

recitation—would have been valid. But, in *Baldwin*, only the following three paragraphs tied the electronic devices to the offense:

> Based on your Affiant's training and experience, Affiant knows that phones and "smartphones" such as the one listed herein, are capable of receiving, sending, or storing electronic data and that evidence of their identity and others may be contained within those cellular "smart" phones. Affiant also knows it is possible to capture video and photos with cellular phones. Further, Affiant knows from training and experience that cellular telephones are commonly utilized to communicate in a variety of ways such as text messaging, calls, and e-mail or application programs such as google talk or snapchat. The cellular telephone device, by its very nature, is easily transportable and designed to be operable hundreds of miles from its normal area of operations, providing reliable and instant communications. Affiant believes that the incoming and outgoing telephone calls, incoming and outgoing text messaging, emails, video recordings and subsequent voicemail messages could contain evidence related to this aggravated assault investigation.
>
> Additionally, based on your Affiant's training and experience, Affiant knows from other cases he [sic] has investigated and from training and experiences that it is common for suspects to communicate about their plans via text messaging, phone calls, or through other communication applications. Further, Affiant knows from training and experiences that someone who commits the offense of aggravated assault or murder often makes phone calls and/or text messages immediately prior and after the crime.
>
> Affiant further knows based on training and experience, often times, in a moment of panic and in an attempt to cover up an assault or murder that suspects utilize the internet via their cellular telephone to search for information. Additionally, based on your Affiant's training and experience, Affiant knows from other cases he has investigated and from training and experiences that searching a suspect's phone will allow law enforcement officers to learn the cellular telephone number and service provider for the device. Affiant knows that law enforcement officers can then

obtain a subsequent search warrant from the cellular telephone provider to obtain any and all cell site data records, including any and all available geo-location information for the dates of an offense, which may show the approximate location of a suspect at or near the time of an offense.

664 S.W.3d at 126. The "boilerplate" language used by the affiant in *Baldwin* at least used his "training and experience" to "know" that a search would lead to evidence. And yet that language was insufficient. Whereas here, the "nexus" was solely based on the affiant's personal beliefs. In other words, nothing in the warrant in this case sufficiently "state[s] facts and circumstances that provide . . . probable cause to believe that . . . searching the telephone . . . is likely to produce evidence in the investigation of certain criminal activity." *See Stocker*, 693 S.W.3d at 388 (quoting TEX. CODE CRIM. PROC. art. 18.0215(c)(5)(B)) (internal quotation marks omitted). Consequently, "the affidavit contained insufficient particularized facts to allow the magistrate to determine probable cause for a warrant to search the phone." *Baldwin*, 664 S.W.3d at 135. Thus, the court of appeals erred when it held that the trial court did not abuse its discretion in denying Appellant's pre-trial motion to suppress.[7]

---

[7] Judge Parker would have us adopt the Massachusetts Supreme Court's reasoning in *Commonwealth v. Fernandes*, 148 N.E.3d 361 (Mass. 2020), to the instant case. *See* Op. of Parker, J., at 2. But Judge Parker's reliance on *Fernandes* is problematic for several reasons.

First, neither party—particularly the State—argues that *Fernandes* is applicable in the instant case. And with good reason.

Second, to the extent that Judge Parker says that "similar considerations are present" between the instant offense and a "domestic violence" offense like the one in *Fernandes*, that assertion is not supported by the facts of each case. *See* Op. of Parker, J., at 3. *Fernandes* dealt with a domestic partner homicide offense between two adults where the defendant not only confessed to killing the victim but had a recent prior domestic violence charge against the same victim. 148 N.E.3d at 373. The evidence sought in *Fernandes* was limited to images in a digital camera from the home obtained one day after the murder. *Id.* In this case, the State sought the evidence obtained here three months after C.F.'s death. Unlike the defendant in *Fernandes*, who had a pending charge of assault and battery of the same victim a few months prior, Appellant did not have a pending charge against anyone, let alone one involving caregiving violence or one involving caregiving violence against C.F. Finally, unlike here, the defendant in *Fernandes* admitted to killing the victim. *Id.*

Third, to the extent that Judge Parker argues that "communications," "records," and "information" relevant to the offense could be found in the electronic devices, that is mere speculation. *See* Op. of Parker, J., at 3. In Massachusetts, the government must "demonstrate a 'nexus' between the crime alleged and the article to be searched or seized." *Commonwealth v. White*, 59 N.E.3d 369, 374 (Mass. 2016) (cleaned up). When a "computer-like device, such as a cellular telephone" is the object of a warrant, the nexus requirement demands more than the mere opinions of the investigating officers. *Id.* at 375. The police must know of "'particularized evidence' related to the crime," and the police must "believe, based on training or experience, that this 'particularized evidence' is likely to be found on the device in question." *Id.* The first warrant fails both requirements; the second warrant fails the first requirement. To justify the search of Appellant's residence and the seizure of the electronic devices discovered, the first affidavit averred that C.F. was under Appellant's care when she died, C.F. died from diphenhydramine, affiant knows that it is common for people to access the internet, and affiant knows that it is common for people to store electronic messages on electronic storage devices. There was nothing in the first warrant that indicated a reason to believe that a particular piece of evidence related to C.F.'s death was on Applicant's electronic devices. In fact, Appellant's electronic devices were not mentioned *at all* other than in the recitation of the affiant's personal experience. *See id.* at 376 ("[E]ven where there is probable cause to suspect the defendant of a crime, police may not seize or search his or her cellular telephone to look for evidence unless they have information establishing the existence of particularized evidence likely to be found there."). The second affidavit fails for similar reasons. The affiant generally averred that searching the seized electronic devices, including Appellant's phone, could reveal electronic searches relating to diphenhydramine's effects on children, and could reveal that electronic

### d. Harm

Texas Rule of Appellate Procedure 44.2(a)'s constitutional error standard applies when evidence obtained in violation of the Fourth Amendment is erroneously admitted. *Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001). Under this "harmless error review, the court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a). The court of appeals should make this determination on remand.

## IV. Preservation of error

In her first point of error, Appellant challenges the court of appeals' conclusion that she did not preserve error when she objected to the admission of extraneous offense evidence during her retrial. The State and Appellant both

---

messages were sent that may contain information about C.F.'s death. This affidavit, like the first, "lack[s] any information establishing the existence of evidence likely to be found on the [Appellant's] cellular telephone." *See id.* at 377. Thus, even under another state's Fourth Amendment jurisprudence, the warrants lack probable cause.

Fourth, and finally, the warrant at issue in *Fernandes* authorized officers to search a digital camera. 148 N.E.3d at 371-72. As already discussed, Massachusetts's nexus requirement for cellphones is greater than those of other electronic devices. The privacy interests at issue in *Fernandes* were lower than those in *White*. *Cf. White*, 59 N.E.3d at 377 n.11 (noting that cellphones with "enhanced capabilities of a 'smartphone' . . . implicate even greater privacy concerns" (citing *Riley*, 573 U.S. at 396–97)). In sum, reliance on *Fernandes*, whether in the lens of Texas law or Massachusetts law, is misplaced.

agree that the court of appeals erred. In her first trial, the State introduced hair follicle test results showing the presence of diphenhydramine in other children. Between Appellant's first and second trials, the laboratory and Dr. Ernest Lykissa, the laboratory's director who had performed the initial hair follicle tests, were discredited. Retesting was impossible because Dr. Lykissa allowed the children's hair to be destroyed. When questioned about the hairs' destruction, he replied, "[M]y bad, as the young men say." Consequently, the hair follicle tests were not admitted during Appellant's second trial.

Instead, the State sought to admit testimony from parents of the other children regarding medical symptoms consistent with diphenhydramine ingestion as extraneous offense evidence under Texas Rule of Evidence 404(b). During a hearing outside the jury's presence, Appellant's trial counsel objected to the parents' testimonies on three grounds: relevance, TEX. R. EVID. 402; lack of proof beyond a reasonable doubt, TEX. R. EVID. 104(b); and the probative value being outweighed by unfair prejudice, TEX. R. EVID. 403. The trial court overruled the objections and granted Appellant running objections. Appellant did not request a limiting instruction and, later during the charge conference of the guilt/innocence phase of trial, did not request a jury instruction that the State must prove that Appellant committed an extraneous offense beyond a reasonable doubt for the jury to consider it.

The court of appeals held that "the proper procedure for preserving a complaint on admission of extraneous-offense evidence was not completed." *Fraser IV*, 2024 WL 4363741, at *9. The court of appeals reasoned that under Texas Rule of Evidence 105, "[t]o preserve the complaint of admission of extraneous-offense evidence, defense counsel was required to request a limiting instruction at the time the evidence was admitted." *Id.* (quoting *Taylor v. State*, No. 06-22-00063-CR, 2022 Tex. App. LEXIS 8160, at *8–9 (Tex. App.— Texarkana Nov. 4, 2022, no pet.) (mem. op., not designated for publication)). The court of appeals held that trial counsel's failure to do so forfeited appellate review. *Id.*

> Rule of Evidence 105 provides:
>
> (a) Limiting Admitted Evidence. If the court admits evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—the court, on request, must restrict the evidence to its proper scope and instruct the jury accordingly.
>
> (b) Preserving a Claim of Error.
>
>> (1) Court Admits the Evidence Without Restriction. A party may claim error in a ruling to admit evidence that is admissible against a party or for a purpose—but not against another party or for another purpose—only if the party requests the court to restrict the evidence to its proper scope and instruct the jury accordingly.
>>
>> (2) Court Excludes the Evidence. A party may claim error in a ruling to exclude evidence that is admissible against a party or for a purpose—but not against another party or for

> another purpose—only if the party limits its offer to the party against whom or the purpose for which the evidence is admissible.

TEX. R. EVID. 105.

The court of appeals' reliance on Texas Rule of Evidence 105 was wrong. Appellant's objections challenged the admissibility of the evidence for *any* purpose and the State's failure to prove its admissibility. Under Rule 105, if the evidence was admissible for a limited purpose, Appellant needed to have requested a limiting instruction in order to preserve error for appellate review. *Id.* R. 105(b)(1). But evidence that is irrelevant, is more prejudicial than probative, or is not sufficient to support a finding beyond a reasonable doubt is not admissible for any purpose. *See id.* R. 104(b), 402, 403. Thus, assuming Appellant was correct that the evidence was not admissible for any purpose, Appellant was not required to request a limiting instruction to preserve error on appeal. *See id.* R. 105. Consequently, the court of appeals erred to conclude that Appellant's objections were not preserved for appellate review. On remand, the court of appeals should address the merits of Appellant's objections on appeal, if necessary.[8]

---

[8] The court of appeals also noted that "defense counsel raised the issue of extraneous offenses and stated 'an instruction that goes to the jury that if there is any extraneous offense or bad acts before they can consider it, they must believe it's been proven beyond a reasonable doubt. *We are not requesting that*[;] *we believe that it is trial strategy.*'" *Fraser IV*, 2024 WL 4363741, at *9 (original emphasis). This may waive a

## V. Conclusion

We affirm in part and reverse in part the judgment of the court of appeals and remand the case to that court for proceedings consistent with this opinion.

**Delivered:  September 3, 2025**
**Publish**

---

claim about whether the State proved the extraneous offenses beyond a reasonable doubt. *Cf. Mitchell v. State*, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996) ("[I]f a defendant, during the guilt/innocence phase, asks for an instruction to the jury on the standard of proof required for admitting extraneous offenses, the defendant is entitled to that instruction." (citing *George v. State*, 890 S.W.2d 73, 76 (Tex. Crim. App. 1994))).